**In re LA FRANCE INDUSTRIES, Inc., et al.**
No. 19393.

District Court, E. D. Pennsylvania.
Jan. 7, 1942.

John H. Gossling and Moore, Gossling & Panfil, all of Philadelphia, Pa., and James Henry Hayes, of New York City, for debtor.

G. Plantou Middleton, of Philadelphia, Pa., for trustee.

John Arthur Brown, of Philadelphia, Pa., for Independent Bondholders' Committee.

Harry Felix, of Philadelphia, Pa., for Bondholders' Protective Committee.

Jenkins, Bennett & Libby and T. Ewing Montgomery, all of Philadelphia, Pa., for Creditors' Committee.

Roper & Caldwell, of Philadelphia, Pa., for Minority Stockholders' Committee.

W. James MacIntosh, of Morgan, Lewis & Bockius, of Philadelphia, Pa., and Sullivan & Cromwell, of New York City, for Indenture Trustee.

Roland C. Heisler, of Drinker, Biddle & Reath, of Philadelphia, Pa., for Tradesmens Nat. Bank & Trust Co.

J. Anthony Panuch and Morton E. Yohalem, both of New York City, for S. E. C.

KIRKPATRICK, District Judge.

This case is now before the Court upon some twenty petitions for allowances for compensation for services legal and otherwise in corporate reorganization proceedings, and for reimbursement for expenses.

La France Industries is a Pennsylvania corporation manufacturing upholstery fabrics (80% of its business) and miscellaneous textile products. It has its principal plant in Philadelphia, and in 1936 owned all the stock of two subsidiaries, one with a plant in the South, the other a Canadian corporation with a plant in Canada. In June, 1936, it filed a voluntary petition under Sec. 77B, Bankr.Act, 11 U.S.C.A. § 207, and was continued in possession of its assets, with direction to operate, until October 14, 1936, when J. Harris Warthman was appointed trustee for both the debtor and its American subsidiary. The Trustee's operation of the properties continued until July, 1941, when a plan of reorganization, which had been approved by the Court December 8, 1939, and, after modification, confirmed June 5, 1940, was finally consummated.

Interim allowances (mainly to the trustee and his counsel) have already been made in the amount of $125,225, but it will simplify the discussion to disregard them and deal with totals rather than balances. Therefore all allowances fixed by this order will be for total compensation, and in each case the amount already received will be deducted before payment.

The allowances requested (including the interim payments) amount in all to $512,058.50 for services and $20,016.44 for expenses. Certain other expenses, incidental to reorganization, have been paid in the course of the proceeding. If all requests should be allowed in full the over all cost of this reorganization would be more than $550,000.

In order to get a starting point, certain factors common to all the requests may be noted:

1. The size of the estate: Treating the debtor and the American subsidiary as one and including the capital stock of the Canadian company owned by the debtor, the appraised valuation of the entire concern as of the beginning of the trusteeship was $2,036,087.18 for liquidation, and $4,326,279.77 as a going business. In connection with the latter figure the following facts have some bearing: The lien indebtedness of the old company was $1,755,000 (bonds, $1,462,500, and defaulted interest, $292,500). The face value of the

bonds and mortgage and certificates of indebtedness of the new company are substantially less than this. In its report upon the proposed plan of reorganization filed in November, 1939, the Securities and Exchange Commission, dealing extensively with property earnings as a basis for valuation, reported the real value as approximately $3,360,000. I am inclined to think that, taking into consideration subsequent developments, if we call this a $4,000,000 enterprise in order to have some idea how much it should cost under normal conditions to reorganize it, we would be stating a figure which is certainly not too low. On this basis, the over all cost would be nearly 14% and the total of the requested allowances for services (excluding expenses) over 12% of the value of the whole. I am not attempting to set up any fixed rule of percentage for the allowable cost of reorganization, and I recognize that the percentages just stated are a little too high, because they do not take account of the fact that when the trustee took over executive duties of some officers there was a compensating reduction of salaries. This, however, I believe did not amount to more than $50,000 in all and to some extent would probably have been made in any event. However, it has been pointed out again and again that the value of the estate and the extent to which it will be burdened or depleted by the allowances are elements for consideration, and it seems plain that in the light of this principle the requested allowances are far too high, and justifiable only by something very unusual in the nature of the proceeding.

2. The whole reorganization was built upon a loan of $600,000 by the Reconstruction Finance Corporation, which was granted only upon condition that costs (not counting the interim allowances already made) would not exceed $250,000. This condition was known to and has been acquiesced in by all the petitioners, and consequently their claims have been presented with the knowledge that some, if not all, of them would have to be substantially reduced. I do not know to what extent, if at all, this fact may have been a subconscious element in the appraisal of the value of their own services by the respective petitioners, but even if it had no effect at all and the amounts requested were all fully justified, the Court would still have the task of distributing a fund of $250,000 among claims aggregating some $380,000.

3. I have referred to the legitimate cost of a normal reorganization. So far as I can see, the only thing about this one which appears to have been much out of the ordinary is the inordinate length of time it took—about four and one-half years, or, to be exact, 56 months. The delay was due almost entirely to a deadlock between two conflicting groups resulting in the abandonment of both competing plans for lack of sufficient consents, and in the total failure to get started upon a really constructive course for two years or more. The things which finally produced action were (chronologically): (a) The entry of a new bondholders' committee into the picture with a threat of liquidation, (b) constructive work on the part of the indenture trustee and the Securities and Exchange Commission, each of whom was in a position to take an impartial stand, and (c) the gradual acquisition by one of the two conflicting groups referred to of controlling interests in both the stock and the bonds.

I hesitate to say that the delay was avoidable, and, certainly, there is no thought of penalizing the present petitioners for the undue protraction of the proceedings. An unselfish attitude is not required or to be expected of security holders or creditors, and attorneys are bound to act in the interest of the parties whom they represent, even if their clients are stubborn and appear to be unreasonable. Still, the record of this case indicates that a good deal of the work done by creditors' committees and their counsel prior to September, 1938, was not a contribution to the reorganization, and therefore more properly chargeable to the interests represented than to this debtor. On the other hand, it is not to be overlooked that this reorganization was entirely successful, and that the company is now operating under a fair and feasible plan approved by the Court after careful scrutiny by the Securities and Exchange Commission, and, so far as I know, satisfactory to all parties in interest. This result was reached without suspension or serious dislocation of the company's business and after a period of highly satisfactory trustee management which, no doubt, made permanent improvements in methods and policies. For this reason it cannot be said that the de-

lay in effecting a plan was detrimental to the whole enterprise. Possibly, confidence in the trustee's ability to operate the company advantageously, which appears to have been generally entertained, removed the normal anxiety to get the company out of the hands of the Court as quickly as possible.

Coming now to the specific requests:

■ Trustee: Mr. Warthman is a textile manufacturer who, when appointed, had recently wound up a business of his own and was exceptionally well qualified by his training and experience to take over the operation of La France. He gave his entire time daily, with very brief vacation periods, to the duties of his trusteeship and acted as the executive head, in the fullest sense, of the organization. Both the company and its creditors have at all times approved his management, and it cannot be questioned that he did an excellent job. During the 56 months of his management, the company's sales totaled $24,847,075, not counting the sales of the Canadian company, which amounted to $5,863,490. The trustee, however, took very little hand in the management of the Canadian company, having determined, rightly, after carefully acquainting himself with the facts, that it was being well and competently managed. Although the debtor was solvent, I think the trustee is quite justified in referring to its financial condition when he took it over as precarious. Prior to the filing of the petition in 77B it had been operating at a substantial loss. At the end of his trusteeship there was an increase in net worth of some $300,000, after a charge of about $800,000 for depreciation and payment of reorganization expenses aggregating about $140,000, but, of course, before interest on bond and mortgage obligations. The extra cost of the trustee's active participation in the management was to some extent balanced by compensating reductions of about $12,-000 per annum in executive salaries. I am of the opinion that the proper allowance for the trustee is $102,666.67, which is on the basis of $22,000 per annum.

■ Counsel for the trustee: Mr. Middleton's claim, exclusive of services in connection with the New York law suit, which will be dealt with hereafter, is for $118,-000. It presents probably the most difficult problem of the lot. I am convinced that the claim is made in perfect sincerity and good faith. I have gone over Mr. Middleton's petition and the office memoranda submitted with it, showing an itemized list of the occasions on which his firm was engaged on business of the trusteeship, and it is plain that a tremendous amount of work was done. This is an important consideration but by no means the only one. To one familiar with the course of this receivership, it is at once apparent that (again with the exception of the New York suit) the legal problems which counsel for the trustee had to meet were not of an exceptional character. My opinion is still that which I stated at the hearing as follows: " * * * this does not strike me as an extraordinary or unusual receivership. * * * it presented a great many problems—the problems were peculiar to it, but they were not in general out of line with the problems that are put ordinarily to a counsel for a trustee or a receiver. * * *" As a matter of fact, a large part of them were not very different from those which the general counsel of such a concern out of receivership is called upon to deal with. This is not to say that the general retainer paid by this company prior to or since reorganization is any criterion. Undoubtedly the existence of a trusteeship creates a situation which involves a larger measure of responsibility and calls for a great deal more work of a legal nature than in the case of an ordinary business. Mr. Warthman made frequent calls upon his counsel for advice in connection with almost every important step or decision involving matters of policy. In response to these calls, Mr. Middleton's firm rendered its opinions only after the most conscientious consideration and research. It is also to be remembered that there were special services in connection with the various plans and particularly the trustee's report upon the debtor's plan. However, when all is said and done, I still think that the claim is considerably in excess of what can properly be allowed. It will be allowed in the total amount of $75,000.

■ Mr. Gossling, counsel for the debtor: The debtor was allowed to remain in possession for about four months after the filing of the petition during which time it was represented by both Mr. Gossling's firm and that of Mr. Pennypacker. For about two months more, these attorneys continued to represent the debtor out of possession. Beginning December 7, 1936,

Mr. Pennypacker withdrew as counsel for the debtor, but continued in the case representing Mr. Gossling as private trustee for a large stockholder, and in this capacity advised in connection with the promotion of the "Gossling Plan," one of the two plans which aborted in the early part of 1938. Mr. Gossling is not now claiming any compensation for services rendered during any part of this period, but limits his claim to the three years following April, 1938. It is based wholly upon services in connection with the plan which was finally adopted. Throughout this period, Mr. Hayes, one of the parties largely interested in the reorganized company, acted with Mr. Gossling. Much that has been said about Mr. Middleton applies to Mr. Gossling. He states in his petition that he "labored both unceasingly and most diligently," and that statement is undoubtedly made in good faith and is true. However, I must consider the value of his services to the reorganization and, so considered, I am unable to give them the value which he claims for them. I believe $55,000 is a proper allowance.

■■ Mr. Pennypacker, counsel for the debtor: This claim relates entirely to services rendered in connection with the Gossling Plan, which had to be abandoned and of which comparatively little substance was carried over into the debtor's plan finally adopted. Mr. Gossling, who worked with Mr. Pennypacker throughout this stage of the proceedings, and who made no claim for that part of his work, testified: "Q. Then I understand that you do not consider your services for the Gossling Plan were of any benefit to the company? A. You can say that if you wish, yes." Here, as in all the requests, the question is not what the services were worth to the interest represented, but only their value to the estate. I also think it proper to state that on a review of the whole matter, in the light of my present knowledge, I have come to the conclusion that the interim allowance of $4,000 allowed to Mr. Pennypacker was more than it should have been. The total amount of compensation is therefore fixed at $6,000.

■ Bondholders' and Creditors' Committees and attorneys for same: There are certain general principles which apply to all of these. Entirely apart from the actual amount of work performed by these petitioners, and the abstract value (if the term is permissible) of their services, two well established rules, binding on me, require a drastic reduction in the amounts claimed.

First: In Dickinson Industrial Site, Inc., v. Cowan, 309 U.S. 382, 60 S.Ct. 595, 599, 84 L.Ed. 819, the Supreme Court held that such claimants are entitled to allowances only for "service rendered to and benefits received by the estate." Services rendered in connection with plans which have been abandoned or in opposing other plans as unfair and unsound, may under special circumstances, command compensation out of the estate, but the question of the value of their contribution to the ultimate reorganization must always be the controlling factor, and it must be decided in the light of the admitted fact that in all cases of this kind the claimants do represent special interests to whom they may look for compensation for such portion of their work as was primarily for their clients. Tested by this principle it is obvious that a very large part of the work done by the Committees and their counsel prior to April, 1938, was absolutely sterile as far as any progress toward a successful reorganization was concerned. Although at the Referee's hearings and during the negotiations there was a great amount of discussion and argument as to the fairness and feasibility of the two opposing plans, the real difficulty was the practical one that the proponent of neither plan ever commanded enough votes to even have his plan considered, and a large amount of the legal work was bound to be wasted effort until that difficulty could be overcome.

■ Second: In Re Standard Gas & Electric Company, 106 F.2d 215, 217, the Circuit Court of Appeals for this Circuit ruled, without qualification and in the plainest possible language, that security holders' committees and their counsel in corporate reorganizations "cannot expect to be compensated at the rate which similar services would command in purely private employment." This rule is broader than the one just stated and applies to claims for services by such committees which directly contribute to the reorganization. Otherwise there would have been no use in stating it.

■ Mr. Brown's claim as counsel for the Independent Bondholders' Committee

involves some special considerations. His contention that he and his committee "started the ball rolling" is not without foundation. Of course, the major hindrance—the deadlocked interests—was, at the same time, being eliminated, and, in addition, the Indenture Trustee's active entry into the negotiations gave the whole thing a strong impetus; so that it is not intended to say that the reorganization would not have got under way without this committee and its counsel. They did, however, make a substantial contribution to the result. Mr. Brown's services covered a comparatively short period, about a year from January, 1938, to February, 1939, and in part were duplicated, or at least assisted, by Messrs. Hayes and Gossling.

Independent Bondholders' Committee:

| | |
|---|---|
| Barclay, Chairman: | $1,000 |
| Wetherill, Member. Disallowed: | — |
| Brown, Attorney: | 6,000 |

Bondholders' Protective Committee:

| | |
|---|---|
| Warnock, Chairman: | 3,000 |
| McClaim, Secretary: | 3,000 |
| Felix, Attorney: | 7,000 |

Creditors' Committee:

| | |
|---|---|
| Klauder, Secretary: | 1,000 |
| Jenkins & Montgomery, Attorneys: | 6,000 |

Minority Stockholders' Committee:

| | |
|---|---|
| Roper, Attorney: | 100 |

Lest there should be any misunderstanding, I will state that the allowances made to the committees' counsel in the foregoing schedule are in most cases less than the fees which similar services would command in purely private employment, but I have no reason to think that the Circuit Court of Appeals did not mean exactly what it said in Re Standard Gas & Electric Corporation, supra, and the ruling is binding upon me.

█ Indenture Trustee and counsel: From what has already been said it appears that the contribution of these petitioners to the final consummation of the plan was a substantial one. In all probability, they were the largest contributors. The great bulk of the services rendered by them began in the early part of 1938 and covered about three years. If this were a matter of private employment, I do not believe that the requests would be criticized, but I think that the circumstances discussed in this opinion make some reduction necessary. It is also apparent that there was a certain amount of duplication between the work of Mr. McIntosh and that of Messrs. Sullivan and Cromwell, and, while any party may have as many attorneys as he pleases, it should not result in a multiplication of allowances. Allowances will be as follows:

| | |
|---|---|
| Marine Midland Trust Company, Indenture Trustee: | $ 5,000 |
| McIntosh and Sullivan & Cromwell: | 25,000 |
| Tradesmens National Bank and Trust Company, as agent to record bondholders' votes and transfer agent: | 2,333.50 |
| Drinker, Biddle & Reath, counsel for Tradesmens National, Indenture Trustee for new Second Mortgage: | 1,250. |

█ Attorneys for Trustee in New York litigation, Middleton, Allen and Harper: This claim stands in a special category, as it is for an interim allowance for certain litigation which was reserved by the trustee and will be prosecuted by him. Inasmuch as interim allowances have already been paid to two of the attorneys, I see no pressing reason why further allowances to them should be made at this time. The total amounts will therefore be:

| | |
|---|---|
| Middleton: | $3,750 |
| Clarke & Allen: | 3,750 |
| Harper & Matthews: | 3,750 |

Accountant, Arthur F. Morton & Co.: Allowed, as requested, $18,500.

Master: The Master's claim for services for $8,750 is approved and allowed.

Allowances for reimbursement of expenses: These will be allowed as follows:

| | |
|---|---|
| Middleton: | $ 627.97 |
| Middleton (New York suit): | 657.51 |
| Harper & Matthews (New York suit): | 280.96 |
| Clarke & Allen (New York suit): | 1,476.45 |
| Gossling: | 10,037.40 |
| Marine Midland: | 687.24 |
| Klauder: | 378.60 |
| Brown: | 300.00 |
| Special Master: | 2,162.86 |
| Bondholders' Protective Committee: | 2,828.27 |

An order may be submitted in accordance with the foregoing.